[Sac. No. 4072. Department One.—March 1, 1929.]

GUY F. ATKINSON, Appellant, v. STATE OF CALIFORNIA, Respondent.

White, Miller, Needham & Harber for Appellant.

Paul F. Fratessa, Fabius T. Finch and Harry A. Encell, for Respondent.

SEAWELL, J.—Appellant and respondent, acting by and through the department of engineering, entered into a contract whereby the former undertook to construct the embankment for a section of the state highway under construction between Coalinga and Fresno, beginning on said highway at engineer's station No. 439 and concluding at station No. 1071, a distance of approximately twelve miles. The plan of construction called for a twenty-four foot roadway, consisting of a fifteen-foot center strip of concrete and dirt shoulders four and one-half feet wide on each side of the pavement. The earthen shoulder or embankment was required to slope outward from the concrete pavement, a distance of four and one-half feet, at the ratio of one and one-half feet horizontal to one foot perpendicular, which grade is known to engineers as a one and one-half to one slope. The earthen shoulders were constructed wider than called for in the contract and instead of having a drop of nine and one-half inches at the outer edge, as per contract, they were built at a grade almost level with the pavement, which added a much greater yardage of earth to the embankment than the appellant was required by his contract to supply. Appellant was not allowed any compensation for furnishing and placing this excess material, which, it is claimed, approximated 12,110 cubic yards of earth. The claim was disallowed on the theory that said resident engineer did not authorize the appellant to depart from the plans and specifications in the particular referred to and if

he had attempted to authorize a departure therefrom it would not have been effective, inasmuch as no request was first made to the commission for the performance of said work, nor was it done in obedience to a written order from the highway engineer of the department of engineering, prerequisites essential to give validity to any change or modification of the plans and specifications after the execution thereof. The second cause of complaint is placed upon the ground that the department of engineering adopted an unfair method of estimating the capacity of the excavation or borrow-pits which previously had been disturbed by flood waters. The demand of appellant for the excess herein claimed over the final estimate made by the department some five months prior to the day appellant filed his claim against the state is 23,741.5 cubic yards, amounting to approximately $26,000.

The appellant was to be paid $1.10 per cubic yard for all excavation made by him in the construction of said embankment. This is to say, the holes from which the material was excavated, known as borrow-pits, were to be measured, and the contractor paid for the number of yards, as shown by the capacity of the excavations or borrow-pits. At about the time said embankment was completed, and before any measurements were taken, the easterly half of said highway was submerged by flood waters which carried into said borrow-pits or excavations silt and earth in such quantities that their original areas could not be satisfactorily measured. The entire westerly half did not suffer such damage.

The finding of the trial court on this branch of the case is "that owing to the flood conditions it became impossible to measure the excavations according to the method provided in said contract and the defendant adopted said method of adding 21.1 per cent more material to the quantity found in the embankment; that plaintiff excavated more material than the measurements of the partially filled excavation would indicate, for which the said defendant has paid by the allowance of 21.1 per cent material more than actual measurement of the embankments; that the character of soil from stations 600 to 1071 was similar; that while the general contour, as shown by the maps and profiles, appears to be similar, as a matter of fact the cuts and fills are dissimilar and not comparable; that the embankments between the same

stations received the same general treatment of rolling and watering; that the excavations from stations 600 to 815 were unaffected by the flood, but the difference between the embankment and excavation, as measured after the storm, is unreasonable and cannot be taken as a standard for determining the quantities of excavation on the other portions of the work; that the excavations between stations 815 and 928 were partially filled by the flood, prior to the measurement thereof, but to a less degree than the excavations between stations 928 and 1071; that the quantity of material between stations 928 and 1071, for which defendant has paid plaintiff, was determined by adding 21.1 per cent to the material found in the embankment after the storm; that the character of the soil between stations 600 and 1071 was such that when treated according to the requirements of the contract, the embankment would have a smaller cubic content than the excavations from which the material had been obtained for the embankment; the court finds that under the contract between plaintiff and defendant, plaintiff was required to roll the earth along the roadbed before placing the filled material therein; that the soil was soft and in the rolling process a depression in the soil was made ranging from three to five inches, varying according to the softness of the soil.

"The Court finds that plaintiff is not entitled to payment for any greater quantity of material than by adding 21.1 per cent of material to the quantity of material actually reposing in said embankment, for which said plaintiff has been paid in full."

No objection is made to the actual measurements of excavations from station 600 easterly to station 815. The borrow-pits between these points were not affected to any material extent by flood waters. Complaint is made, however, that the actual measurements of said partially filled borrow-pits between stations 815 and 928 were treated as though they had not been affected by flood waters and were included as a factor in calculating the percentage of shrinkage in computing the whole distance from stations 600 to 928, upon which a general average was struck. In other words, appellant claims that upon the court's finding that the borrow-pits between stations 815 and 928 had been partially filled it should have treated said pits as partially filled

by silt and debris and not as pits of the same areas as originally constructed. From stations 815 to 928 the excavation area was smaller than the corresponding embankment measurements showed. It is accepted as an engineering fact that under compression such as is employed in highway construction the excavation measurement should be much larger than the embankment measurement in cases where the soil is of the character of that existing between stations 815 and 928. By measuring the pits between stations 600 and 928— which included the partially filled pits between 815 and 928—and the embankment between said stations 600 and 928, the shrinkage factor was estimated to be 21.1 per cent, and the embankment measurements between stations 928 and 1071 were accordingly increased by said per cent, and the resulting figure was adopted as the area of the excavations between stations 928 and 1071, as they originally existed.

It appears that the unaffected area from station 600 to station 815 showed a shrinkage factor of 52.9 per cent. From station 815 to station 928 there appeared to be nineteen per cent less excavation than embankment. This variance can be accounted for only on the theory that the borrow-pits in the area were in a partially filled state, rather than in their original state.

The important question in the case is to ascertain as nearly as possible the normal shrinkage factor. In justice to the learned trial court, this was a matter attended with difficulties. It would seem reasonably certain, however, that the whole distance between stations 815 and 928 should not have been included as undisturbed area in an effort to ascertain the original contents of the borrow-pits. It would appear that the borrow-pits within the limits of station 600 to station 815 would furnish a fairer basis for estimate as to capacity than would the inclusion of station 928. It should not be extremely difficult for engineers and others familiar with local conditions to determine upon the ground approximately the point at which the disturbance of said pits or excavations began. The 21.1 shrinkage factor adopted by the learned trial judge would appear also to be 3.15 per cent smaller than the average estimate of the four engineers who testified on the subject, one of whom was called by plaintiff and the other three by defendant. The average

shrink from the figures given by said engineers establishes the shrinkage at twenty-four and one-fourth per cent.

■ The other point pressed by appellant has to do with approximately 12,000 cubic yards of earth placed in embankment form in excess of the quantity required to be furnished by the provisions of the contract, for which appellant received no compensation. This extra material was rejected by the commission as "unauthorized." This issue involves a question of fact as to whether the resident engineer, who is alleged to have ordered the extra material furnished, did in fact do so, and, further, if he did order said work done, was he expressly authorized to so act? The solution of this question is dependent upon evidence, the weight of which cannot be passed upon by an appellate court. Other questions of fact presented in the case are wholly questions for decision by the trial court in the exercise of a sound discretion.

Upon a full consideration of the case we are of the view that appellant is entitled to a greater amount for his services than was produced by the application of the 21.1 per cent shrinkage factor and that a more satisfactory basis of compensation will be established upon a retrial of the cause.

Judgment reversed.

Curtis, J., and Preston, J., concurred.

Hearing in Bank denied.